ALFRED J. CARTER, JR., and CLARICE L. CARTER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Carter v. Commissioner
Docket No. 1189-82.
United States Tax Court
T.C. Memo 1984-443; 1984 Tax Ct. Memo LEXIS 232; 48 T.C.M. (CCH) 909; T.C.M. (RIA) 84443; August 15, 1984. *232 Held: Petitioners did not realize any net income in 1979 from participation in marijuana smuggling venture. H. Randolph Fallin, for the petitioners. Max Boyer, for the respondent. WHITAKER
MEMORANDUM FINDINGS OF FACT AND OPINION WHITAKER, Judge: Respondent determined a deficiency in petitioners' income tax for the calendar year 1979 in the amount of $70,170 and an addition to tax under section 6653(a) [1] in the amount of $3,509. The deficiency is based on the failure to *233 report for income tax purposes the sum of $150,000 allegedly derived from participation in the smuggling of marijuana into the United States from Columbia, South America. As presented to the Court by the parties, the issue is solely a factual one, largely dependent on the credibility of witnesses. Our Findings of Fact and Opinion are combined. Most of the facts have been stipulated and with a few critical exceptions are not essentially in dispute. At the time they filed their petition, petitioners resided in Jacksonville, Florida. Alfred J. Carter, Jr. (petitioner), is one of several protagonists involved in the smuggling of marijuana into Morgan City, Louisiana, in April of 1979. During all material times, petitioner was a commercial shrimper generally operating out of Jacksonville, Florida. In 1977, petitioner became involved in the smuggling of marijuana into the United States. Sometime prior to 1979, one Raymond Guthrie, Jr. (Guthrie), provided petitioner with funds *234 to purchase a 73-foot shrimp boat that had sufficient fuel capacity to travel long distances and sufficient cargo capacity to hold at least 40,000 pounds of marijuana. Petitioner used the boat in his shrimping business as well as for several smuggling ventures, including the smuggling episode at issue here. Apparently sometime between the acquisition of the boat and the smuggling trip that is before the Court, petitioner became disenchanted with the smuggling operations in which he was involved but felt under sufficient obligation to Guthrie--because of the latter's funding of the purchase of the boat--that petitioner agreed to the use of his boat for another smuggling venture during 1979. He declined, however, to serve as captain or otherwise to be present on the boat during the run. Accordingly, petitioner procured a captain by the name of Aderholt, and he hired his son and son-in-law, Frank Carter and Herbert Lively (Lively), to serve as crew. Guthrie provided one of his associates as a radio man and installed radio equipment sufficient to enable Guthrie or his associates to keep in touch with the boat during its trip. For the use of his boat and such other services as petitioner *235 might be called upon to perform, Guthrie promised petitioner approximately $500,000. Aderholt was promised $150,000 and the two crew members, Frank Carter and Lively, $20,000 to $25,000 each. All participants understood that all compensation would come from Guthrie, petitioner not having funds to finance such a venture. In addition, Guthrie furnished petitioner with approximately $8,000 in cash to provision the boat, most of which was used for fuel. After traveling to Columbia and being loaded with some 40,000 pounds of baled marijuana, the boat finally returned to the vicinity of Morgan City, Louisiana, where it was to be unloaded and the marijuana disposed of by or at the direction of Guthrie. During this stage of the venture, another of the protagonists, one Charles Webster (Webster), appeared on the scene. Webster was a friend of Guthrie who accompanied Guthrie, petitioner and others to meet the boat. Petitioner's boat encountered difficulties in making contact with the unloading crew and was required to lie offshore for approximately a week. Webster accompanied petitioner out to the boat with provisions, and Aderholt disembarked temporarily. Webster remained on the boat *236 with petitioner and the crew members awaiting an opportunity for the unloading. During this time, Webster, as a "friend" of Guthrie, discussed with the crew members, Frank Carter and Lively, a possible increase in their compensation to $50,000 each. Petitioner was present during this conversation. Thereafter, Webster appears to have assumed the role of the contact between Carter and Guthrie. At the end of the week, the marijuana was unloaded, and Aderholt reboarded the boat. Some funds were provided to petitioner by or at Guthrie's direction in order to pay part of the cost of repairs to the boat before it could be returned to Jacksonville. Several weeks after the unloading of petitioner's boat, petitioner was instructed to appear at a rendevous in Sarasota, Florida, where he received $70,000 in cash, mostly in $20 bills, furnished by Guthrie and delivered by two men. This money he brought back to his house and distributed in the amounts of $10,000 each to Frank Carter and Lively and $50,000 to Aderholt. These payments were understood to be partial payments on agreed compensation to the captain and crew. Sometime thereafter, Webster delivered to petitioner additional funds, *237 the exact amount of which is in dispute. Petitioner's contention is that he received exactly $95,000 in cash from Guthrie Through Webster, $75,000 of which he delivered to Aderholt and $10,000 each to Lively and Frank Carter. [2] Aderholt did not testify, but by stipulation his testimony in Guthrie's previous criminal trial was included in this record. In that trial, where the amounts of money paid and received were not of particular significance, Aderholt testified that he had received for his services in two installments exactly $50,000 and no more. Webster testified that he was given $200,000 by Guthrie in two packages, $50,000 of which Guthrie told him was intended for Webster as compensation for his services, and $150,000 of which was intended to be delivered to petitioner. However, Webster did not count either package at the time that he received it and never counted the money in the parcel he delivered to petitioner. Petitioner's position is that Webster delivered the latter package to him, that he counted it sometime after he had taken it back to his residence in Jacksonville, and that it contained only $95,000. He unequivocably testified that he kept nothing out of these *238 funds for himself, and for the reasons that follow we are inclined to believe that he is telling the truth. [3]
No one disputes that Aderholt, Frank Carter and Lively received payments on two occasions. Frank Carter did not testify, and his whereabouts at the time of trial apparently were unknown. Lively testified that he had himself been paid on two occasions, each time in the amount of $10,000 and that he saw petitioner pay Frank Carter and Aderholt on each such occasion; *239 however, Lively's testimony (consistent with that of petitioner as to the amounts given to Aderholt and Frank Carter) is based on what petitioner said to those individuals in Lively's hearing. Lively, of course, is petitioner's son-in-law and was convicted in connection with the marijuana smuggling. Nevertheless, he appeared to us to be testifying forthrightly and candidly, and we see no reason to disbelieve his testimony. With regard to Webster's testimony, there is some dispute as to the sum of money Webster delivered to petitioner. There also are some other discrepancies between Webster's testimony and that of petitioner. For example, Webster testified that petitioner had importuned him on a number of occasions to obtain funds from Guthrie and that his delivery of money to petitioner was in response to those repeated requests. Petitioner, on the other hand, presumably in part to explain why he failed to retain any of the funds received from Webster for himself, testified that his prodding of Webster took place after the receipt of the money, rather than before. On another point, Webster clearly indicated that the funds furnished to him by Guthrie for delivery to petitioner *240 were contained in some sort of a plastic zippered bag, whereas petitioner testified that he received the funds from Webster in a paper sack. We note that on every other occasion where funds were received or delivered, they apparently were contained in paper sacks. Naturally, it is respondent's contention that the Court should give credence to the testimony of Webster concerning the statement to him by Guthrie, [4] and the stipulated testimony by Aderholt. Respondent obviously contends that petitioner is not testifying correctly and that there are inconsistencies between petitioner's testimony before us and his testimony in Guthrie's criminal trial. We are not persuaded, however, that petitioner's prior testimony was *241 inconsistent with his position in the instant case. For example, in the criminal trial, petitioner indicated that he was paid for some of his efforts in the 1979 smuggling venture, but that he did not receive all the money he was supposed to. While respondent would interpret this statement as being contrary to petitioner's present testimony that he received no smuggling income in 1979, we believe that his earlier statement reasonably expresses his belief that the funds that he received and passed on to the boat's crew constituted part of all the funds to which he andhiscrew were entitled. Other prior testimony referred to by respondent, in which petitioner had admitted in Guthrie's previous criminal trial to telling lies under oath on earlier occasions, is substantially mitigated by the fact that petitioner in that previous trial also stated that he believed that his immunity from prosecution for his testimony would only be honored if he told the truth. He thus had--and has--a compelling incentive to testify honestly. While Aderholt's prior testimony in the criminal trial that he only received a total of $50,000 from petitioner is inconsistent with petitioner's current *242 position that he paid $125,000 to Aderholt, we do not feel compelled to disbelieve petitioner solely on the basis of this contradiction. Petitioner was a credible witness, whose testimony we are inclined to believe in the absence of compelling reasons not to. Therefore, we accept petitioner's testimony as correct and as overriding implications to the contrary in Webster's testimony and Aderholt's testimony in the criminal trial. Petitioner received from Guthrie an aggregate of $165,000 plus the expense money for the trip of $8,000 and money for repairs in an unidentified amount. Petitioner did not keep any of this money, expending the expense money for fuel and repairs, and delivering $20,000 each to Frank Carter and Lively and $125,000 to Aderholt. Petitioner argues that he was simply a conduit with respect to the payments made to Messrs. Aderholt, Frank Carter and Lively. We do not believe that petitioner was such a mere conduit. However, unless under some theory the $165,000 and the $8,000 are taxable to petitioner even though the funds were disbursed or used in accordance with our findings, we must find for petitioner on this record. We think the record indicates that *243 the members of the crew procured by petitioner for his boat were employed by petitioner, not by Guthrie, even though it was understood that their compensation would ultimately come from Guthrie. Thus, while the funds petitioner received from Guthrie were part of petitioner's gross income, the compensation paid to the three members of the crew and the funds used for fuel and for boat repairs were deductible expenses under section 162 unless deduction is precluded by the "illegal payments" prohibition of section 162(c)(2). [5] There is no evidence in the record that this subsection is applicable, however. Disbursement of these funds does not constitute the making of illegal payments even though the smuggling transaction was obviously illegal. ; ; . [6] The payments thus were deductible under section 162.
*244 In view of our holding with respect to the alleged deficiency, the addition to tax under section 6653(a) is inappropriate. Decision will be entered for petitioners.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, and all rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Petitioner explained that it is the custom for a boat crew to be paid before the boat owner retains compensation for himself. ↩
3. The parties stipulated that Webster delivered $150,000 to petitioner from Guthrie for petitioner's involvement in the Morgan City trip. The stipulation reflected counsel's understanding of the facts prior to the trial and may reflect the substance of Webster's testimony in the Guthrie trial, as well as Aderholt's testimony. At the commencement of the trial, petitioners' counsel disavowed this item of the stipulation (item 9). In view of the critical nature of this disputed fact, we decline to accept this item in the stipulation but instead make our own findings on this point.↩
4. We note that Webster's testimony in the instant proceeding that he gave petitioner $150,000 rather than the $95,000 petitioner admitted receiving was not based upon Webster's personal knowledge but rather upon the inherently unreliable assumption that what Guthrie told him concerning the amount was true. While statements of coconspirators may not be, as respondent claims, hearsay, we are not required to believe them when contrary to more reliable evidence.↩
5. We note that sec. 280E is not applicable to the year involved.↩
6. See also ; .↩